IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VALETTA McMURRAY,

           Plaintiff,                 No. CIV S-09-2245 GEB EFB PS

   vs.

COUNTY OF SACRAMENTO, et al.,

           Defendants.       <u>ORDER AND</u>
                                 <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

      This action proceeds before the undersigned pursuant to Eastern District of California Local Rule 302(c)(21) and 28 U.S.C. § 636(b)(1).  Defendants County of Sacramento, Sheriff John McGinness, Deputy Sheriff Javier Bustamante, Deputy Sheriff V. Candido, and Deputy Sheriff L. Culp move for summary judgment and/or summary adjudication.  Dckt. No. 34.  A hearing on the motion was held on May 11, 2011.  Attorney Kristina Hall appeared at the hearing on behalf of defendants; plaintiff appeared pro se.  For the reasons stated herein, the court recommends that defendants' motion be granted in part and denied in part.

I.     <u>BACKGROUND</u>

      Plaintiff initiated this action on August 10, 2009, alleging (1) a claim against defendants Bustamante, Candido, and Culp under 42 U.S.C. § 1983 for violation of her deceased son Damion McMurray's ("Damion") civil rights under the Fourth, Fifth, and Fourteenth

1

Amendments; (2) a claim for violation of her own civil rights under the Fourteenth Amendment; (3) a claim against the County of Sacramento and Sheriff McGinness under § 1983 for supervisory and *Monell* liability; and (4) a wrongful death claim against all defendants pursuant to California Civil Procedure Code section 377.60.  Compl., Dckt. No. 2.

Defendants move for summary judgment and/or summary adjudication on all of plaintiff's claims.  Defs.' Mot. for Summ. J., Dckt. No. 34.  With regard to the first claim, based on violations of Damion's rights, defendants argue that (a) Damion's Fifth Amendment due process claim fails because there are no federal government actions; (b) Damion's Fourteenth Amendment claim fails because it is more properly asserted as a Fourth Amendment claim; and (c) Damion's Fourth Amendment claim fails because the deputies' use of force was reasonable and the individual defendants are entitled to qualified immunity.  *Id.* at 18-22, 23-26.[1]  With regard to the second claim, based on violations of plaintiff's Fourteenth Amendment rights, defendants argue that (a) the claim fails as a matter of law, and (b) the individual defendants are entitled to qualified immunity.  *Id.* at 22-23, 26-27.  With regard to plaintiff's third claim against the County and Sheriff McGinness, defendants argue that (a) there is no causal link between Sheriff McGinnis and the alleged constitutional violations and (b) there is no evidence to support a *Monell* claim against the County of Sacramento.  *Id.* at 27-29.  Defendants also argue that plaintiff's fourth claim for wrongful death fails as a matter of law since the defendants are each entitled to immunity under the California Government Code.  *Id.* at 30-31.  Finally, defendants contend that there is no basis for plaintiff to seek punitive damages.  *Id.* at 32-34.  Plaintiff opposes the motion.  Pl.'s Opp'n, Dckt. No. 39.

////

////

////

---

[1]  For ease of reference, all citations to page numbers are to the page numbers assigned by the court's case management and electronic case filing (CM/ECF) system.

II.     FACTS

This case involves the October 15, 2008 fatal shooting of plaintiff's son, Damion McMurray ("Damion"), by a Sacramento County deputy sheriff, as well as the use of a taser on Damion by another Sacramento County deputy sheriff, and the circumstances surrounding the entire incident.  Although it is undisputed that the shooting and the use of the taser occurred, many of the facts surrounding the October 15 incident are disputed.[2]

A.      Defendants' Statement of Facts

According to defendants, early in the afternoon of October 15, 2008, Sacramento County Sheriff's Deputy L. Branden Culp responded to a call for emergency service at the Dry Creek Apartments in Rio Linda, California concerning a verbal dispute between neighbors, in which the caller complained that the son of one of her downstairs neighbors was cursing at her daughter.  Defs.' Statement of Undisputed Material Facts ("UMF"), Dckt. No. 34-2, ¶¶ 1-3.[3] When Culp arrived at the apartment complex, he encountered an African-American adult female wearing a white shirt near the doorway of Apartment #2, which was a ground level apartment unit.  *Id.* ¶ 4.  The woman told Culp that she was the mother of the person causing the disturbance and apologized for his actions.  *Id.* ¶ 5.  It appeared to Culp that the woman was trying to resolve the situation with the neighbor who had called for service.  *Id.* ¶ 6.  Culp also saw an African-American adult male wearing a red shirt, who appeared to be the woman's son, but it was explained to Culp that this person was not the source of the dispute.  *Id.* ¶ 7.  Because it did not appear to Culp that the person who caused the confrontation was still on the premises, Culp cleared the call and left the scene.  *Id.* ¶ 8.

////

---

[2] At the May 11 hearing, defense counsel acknowledged that if plaintiff's statement is taken into account, there are several disputes of fact.

[3] All citations to the Statement of Undisputed Material Facts herein incorporate by reference those citations stated in the UMF in support of each undisputed fact.

Approximately 10 or 15 minutes later, Culp heard a second emergency call come in from the Dry Creek Apartments, pertaining to an African-American male subject, not wearing a shirt, who was acting "crazy" and hitting passing cars with his fists.  *Id.* ¶¶ 9-10.  The 911 call also indicated that the subject had a gun inside a sock and wanted to commit suicide.  *Id.* ¶ 11.

Culp returned to the Dry Creek Apartments, and at approximately the same time, Sacramento County Sheriff's Deputy Javier Bustamante and his trainee Deputy Vincent Candido were also on patrol in the area.  *Id.* ¶¶ 12-13.  Bustamante and Candido received an emergency dispatch indicating that an African-American adult male, wearing blue jeans and no shirt, was running around in the street near the Dry Creek Apartments with a handgun in a sock and banging on the windows of passing cars, and indicating that the subject may be suicidal.  *Id.* ¶¶ 14-15.  Bustamante and Candido responded to the location of the call, and when they arrived on scene, Bustamante decided to bring his law enforcement rifle ("LER" – a fully loaded M-16 semiautomatic rifle) due to the serious nature of the emergency call.  *Id.* ¶¶ 16-17.  Bustamante strapped the LER across his chest while he and Candido conferred regarding the best way to handle the situation.  *Id.* ¶ 18.

Shortly after Bustamante and Candido arrived at the Dry Creek Apartments, Culp also arrived on scene.  *Id.* ¶ 19.  Culp suspected that the subject of this second emergency call might be the same person who caused the problems that resulted in his response to the apartment complex the first time, so he directed Bustamante and Candido toward Apartment #2.  *Id.* ¶ 20.

The three deputies walked together toward the apartment complex, and as they approached the apartment, they heard male and female voices yelling.  *Id.* ¶¶ 21-22.  Culp saw the same woman in the white shirt and the man in the red shirt that he encountered during his response to the first call.  *Id.* ¶ 23.  The man in the red shirt was later identified as Arlandis McMurray ("Arlandis"), while the woman was later identified as his mother, Valetta McMurray (plaintiff).  *Id.* ¶ 24.  Arlandis and plaintiff were standing in the doorway of the apartment yelling and arguing with someone inside.  *Id.* ¶ 25.  A man with no shirt came all the way out of the

apartment; he was waving his arms and yelling and screaming and had what appeared to be a black sock in one of his hands. *Id.* ¶¶ 26, 27. The man without a shirt was later identified as Damion McMurray ("Damion"). *Id.* ¶ 28. The deputies believed that Damion matched the description of the subject of the emergency call about a man who was acting crazy, not wearing a shirt and possibly carrying a gun in a sock. *Id.* ¶ 29.

Damion appeared to be talking on the phone. *Id.* ¶ 30. Bustamante and Culp tried to get control of the situation but the three people continued yelling and screaming. *Id.* ¶ 31. Culp finally told Arlandis to walk toward him and turn around to be handcuffed. *Id.* ¶ 32. Initially, Arlandis hesitated but eventually complied. *Id.* ¶ 33. Culp took Arlandis to a location to sit just out of sight around the corner near a stairwell. *Id.* ¶ 34. Plaintiff continued to yell and scream and told Damion to get off the phone. *Id.* ¶ 35.

Bustamante told Damion numerous times to put the phone down and comply so that he could be placed in handcuffs and the deputies could determine what was going on. *Id.* ¶ 36. Plaintiff tried to grab the phone away from but it dropped to the ground and Damion ran toward the apartment. *Id.* ¶ 37. Bustamante tried to grab Damion as he went into the apartment but was unable to get hold of him. *Id.* ¶ 38.

The deputies momentarily lost sight of Damion when he disappeared into the apartment. *Id.* ¶ 39. The deputies feared that Damion might be going inside to get a weapon in light of the nature of the call that had brought them to the apartment complex. *Id.* ¶ 40. The deputies were fearful because they did not know what or who may have been inside the apartment. *Id.* ¶ 41.

Culp then ran toward the door to follow Damion. *Id.* ¶ 42. Damion was immediately inside the doorway. *Id.* ¶ 43. Culp deployed his taser weapon in the hope that it would end the confrontation and gain Damion's compliance.[4] *Id.* ¶ 44. Both prongs of the taser hit Damion and he fell on the floor and laid on his stomach. *Id.* ¶ 45. Bustamante was standing near

---

[4] At the May 11 hearing, defendants indicated that the taser Culp deployed was in dart mode, as opposed to drive-stun mode.

the doorway outside the apartment and he and Culp both directed Damion to put his hands behind his back so that he could be handcuffed. *Id.* ¶ 46. Damion seemed to comply but then he suddenly put his hands up underneath him, pushed himself up off the floor and jumped in front of Culp and toward Bustamante, who was standing near the doorway. *Id.* ¶ 47. Bustamante tried to jump out of Damion's path, but Damion ran toward him. *Id.* ¶ 48. Culp chased Damion, who still had the taser barbs connected to his body, and initiated a second taser burst to try to control him. *Id.* ¶ 49. The second taser burst had very minimal effect. *Id.* ¶ 50. Damion fell to the ground and laid there for only a few seconds. *Id.* ¶ 51.

Culp again directed Damion to put his hands behind his back and comply with the commands of the deputies, but Damion refused to comply. *Id.* ¶ 52. Suddenly, Damion jumped up again and rushed toward Bustamante. *Id.* ¶ 53. Culp deployed the taser a third time, but it had no effect at all. *Id.* ¶ 54.

Damion wrapped his arms around Bustamante, causing there to be very close bodily contact with Bustamante. *Id.* ¶ 55. Culp concluded that he could not use the taser again because he feared that the taser could affect Bustamante due to the bodily contact between Damion and Bustamante. *Id.* ¶ 56. The contact between Damion and Bustamante also greatly concerned all three deputies because of the difference in physical size between Damion and Bustamante. *Id.* ¶ 57. Damion was approximately 6'7" and weighed approximately 200 lbs., while Bustamante is about 5'7" and weighs approximately 170 lbs. *Id.* ¶ 58. As Damion had his arms wrapped around Bustamante, Bustamante tried to keep his LER weapon out of Damion's reach. *Id.* ¶ 59. Bustamante suddenly felt Damion tugging on his belt and holster and immediately recognized that Damion was actively trying to take away his service pistol. *Id.* ¶ 60. In accordance with his training, Bustamante tried to push Damion off, while Candido ran over to the altercation and tried to pull Damion off of Bustamante; Candido's efforts to pull Damion away were unsuccessful because of the significant advantage in physical size and strength that Damion had. *Id.* ¶ 61. At the same time, Bustamante attempted to release the safety hood on his security

holster so that he could gain access to his service pistol because he believed that the escalating degree of Damion's physical contact was most likely going to warrant utilizing his firearm. *Id.* ¶ 62. When Bustamante went to release the safety hood on his security holster, he realized that it had already been released. *Id.* ¶ 63. Bustamante was alarmed because this fact confirmed to him that Damion definitely had tried, and was continuing to try, to take away his fully-loaded pistol in the course of the physical struggle. *Id.* ¶ 64. Bustamante immediately realized that there was no way that he could protect the LER strapped to his chest, his service pistol and continue to properly fight off Damion's advances all at the same time. *Id.* ¶ 65. Bustamante was able to slightly push away from Damion with his left hand while simultaneously drawing his weapon, a .40-caliber Sig Sauer pistol, with his right hand. *Id.* ¶ 66. Pursuant to Sheriff's Department regulations, Bustamante's pistol was loaded with thirteen rounds of ammunition. *Id.* ¶ 67. Despite Bustamante's attempts to push away from Damion, the two men were still very close to each other, less than arm's length apart. *Id.* ¶ 68. Damion showed no signs of ceasing his attack or complying with the officers' directives. *Id.* ¶ 69.

Bustamante was fearful that if Damion overpowered him, he could take away one or both of his loaded weapons and harm or possibly kill him, the other deputies and others nearby. *Id.* ¶ 70. In extreme fear for the safety of the other deputies, nearby citizens and himself, Bustamante believed he had no other choice but to use his weapon as a means of force against Damion. *Id.* ¶ 71. Bustamante fired two rounds from his pistol, hitting Damion in the center mass, and again tried to push away from Damion. *Id.* ¶ 72. Only after Bustamante had fired the two rounds did Damion finally release him. *Id.* ¶ 73. Bustamante backed up with his weapon still drawn and observed Damion to determine whether he needed to continue utilizing force against him or whether he should stop. *Id.* ¶ 74. Damion sat back on the ground while Bustamante continued to cover him with his drawn pistol; Bustamante did not fire any additional rounds because Damion was no longer actively attacking him. *Id.* ¶ 75. Bustamante and Culp both called for back-up assistance to respond to the scene and for emergency medical care for

1    Damion. *Id.* ¶ 76.  Damion ultimately died from the injuries he sustained as a result of the

2    gunshot wounds. *Id.* ¶ 77.

3        B.    Plaintiff's Statement of Facts

4         Plaintiff's opposition to the summary judgment motion, which she labels as a "motion

5    against summary judgment," is actually a narrative statement by plaintiff that begins with the

6    phrase "I Valetta McMurray declare as follows:."  Dckt. No. 39.  The document is essentially

7    Ms. McMurray's declaration that includes her description of what she claims to have witnessed

8    just prior to and at the time of the shooting.  However, the statement lacked a verification clause

9    stating that it was submitted under penalty of perjury.  At oral argument plaintiff was provided

10   an opportunity to resubmit her declaration under penalty of perjury. Thereafter she submitted her

11   corrected declaration and the declaration of Shirley Lee, both of which are verified as submitted

12   under penalty of perjury.[5]  Dckt. No. 42.  Additionally, plaintiff's opposition has attached to it

13   her response to defendants' statement of undisputed material facts, which includes additional

14   factual assertions by plaintiff.[6]  *See* Dckt. Nos. 39, Attach. 1.  Collectively, these documents

15   _____

16       [5] These corrections moot objections to plaintiff's factual statements. *See, Jones v.*
     *Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (requiring that where a pro se plaintiff makes factual
17   contentions in opposition to a motion for summary judgment, those contentions must be based on
     personal knowledge and the plaintiff set forth facts that would be admissible in evidence,
18   "attested [to] under penalty of perjury that the contents of the motions or pleadings are true and
     correct."); 28 U.S.C. §1746 (requiring all affidavits to be made on personal knowledge under
19   penalty of perjury).

20       [6] Plaintiff's response to the statement of undisputed facts is signed by plaintiff, and
     Federal Rule of Civil Procedure 11(b) provides that "[b]y presenting to the court a pleading,
21   written motion, or other paper — whether by signing, filing, submitting, or later advocating it —
     an attorney or unrepresented party certifies that to the best of the person's knowledge,
22   information, and belief, formed after an inquiry reasonable under the circumstances: . . . (3) the
     factual contentions have evidentiary support or, if specifically so identified, will likely have
23   evidentiary support after a reasonable opportunity for further investigation or discovery; and (4)
     the denials of factual contentions are warranted on the evidence or, if specifically so identified,
24   are reasonably based on belief or a lack of information."  Additionally, at the summary judgment
     stage, the court does "not focus on the admissibility of the evidence's form. We instead focus on
25   the admissibility of its contents." *Fraser v. Guzdale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003)
     (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary
26   judgment, a party does not necessarily have to produce evidence in a form that would be
     admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil

1  assert the following version of what occurred, which stands in stark contrast to defendants'

2  account of the events.

3      According to plaintiff, on October 15, 2008, she and her two sons were at her residence,

4  Rio Garden Apartments, in Rio Linda, California.  Pl.'s Decl., Dckt. No. 42, at 2.  Damion had

5  begun doing his laundry and Arlandis was waiting to pick his son up from school.  *Id.*  The three

6  of them were having a conversation about the loss of plaintiff's sister's only child just two weeks

7  prior to Damion arriving home.  *Id.*  Damion was emotional over the death of his cousin and was

8  upset that he was not able to be with his family at the time of his cousin's death.  *Id.*

9      Damion then stepped outside and walked over by the end of the walkway by the stairs.

10 *Id.*  By this time, a young lady that lived in the upstairs apartment, apartment 12, walked up to

11 the walkway and told Damion to move.  *Id.*  Damion told her to go around him and that he was

12 not in the way.  *Id.*  Walking up the stairs, the young woman said "fuck you" to Damion for not

13 moving, and in response Damion said "fuck you" back.  *Id.*  Plaintiff then told Damion that his

14 conduct was unnecessary.  *Id.*  Damion then went back inside the house.  *Id.*

15     Arlandis and plaintiff then went upstairs to apologize to the young lady.  *Id.*  When they

16 got upstairs, Arlandis knocked on the door and after a minute or two, the door opened and it was

17 an elderly lady that answered.  *Id.*  Plaintiff told the lady that she lived downstairs and that she

18 came to apologize for Damion, who was upset over the death of a family member.  *Id.*  The lady

19 replied by saying that her daughter was not home at the moment and that she would be the one to

20 apologize to.  *Id.*

21     By this time, Officer Culp arrived.  *Id.*  As Culp headed upstairs, he first encountered

22 Arlandis.  *Id.*  Arlandis told the officer that he and plaintiff just went upstairs to apologize.  *Id.*

23

24 Procedure 56.");  *Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991)
   ("the nonmoving party need not produce evidence in a form that would be admissible at trial in
25 order to avoid summary judgment.") (internal quotation marks and citation omitted).
   Accordingly, plaintiff's statements in her response to the statement of undisputed facts are
26 considered in analyzing this motion.

1    Culp said that they seemed to have the situation under control and then left.  *Id.*

2           Arlandis and plaintiff then went back downstairs and entered the house.  *Id.*  Damion was

3    standing by the washer waiting for it to stop.  *Id.*  Plaintiff could see that he was upset and

4    suggested that they watch a movie.  *Id.*  Damion agreed.  *Id.*  As plaintiff then proceeded to get

5    the movie, Damion began to rap lyrics to a rap song and began to ad lib.  *Id.*  Plaintiff then sat

6    her chair next to the chair Arlandis was seated in, and she and Arlandis sat and listened to

7    Damion rap.  *Id.*  Arlandis stated that he was going to go to the store, which was located next

8    door, and plaintiff replied with a simple "O.K."  *Id.*

9           Damion continued to rap the songs a few seconds more and then both he and plaintiff

10   walked outside.  *Id.*  As they stood outside, they had a conversation "about things of the heart."

11   *Id.*  After the conversation, they both went back into the house.  *Id.*  Plaintiff sat down and

12   Damion went toward the bathroom as Arlandis returned from the store.  *Id.*  Damion came back

13   into the living room and, after scanning the room, picked up his black socks and walked toward

14   the door and went outside.  *Id.*

15          Plaintiff continued to sit in the chair, and a few minutes later, she heard Damion's voice,

16   so she got up and went to the door to see where he was.  *Id.*  When plaintiff stepped outside, she

17   saw Damion across the street walking.  *Id.*  Damion was also talking, but plaintiff could not

18   understand him clearly.  *Id.*  Plaintiff then told Arlandis to get his brother and Arlandis walked in

19   the direction that Damion was heading.  *Id.*  Arlandis was calling his name.  *Id.*

20          Plaintiff went back inside the house and called her sister, Shirley Lee.  *Id.*; *see also* Decl.

21   of Shirley Lee, Dckt. No. 42 at 5.  When Shirley answered, plaintiff said her name and Shirley

22   asked her what was wrong.  Pl.'s Decl. at 2.  Plaintiff told Shirley to pray.  *Id.*  Plaintiff told

23   Shirley that she and Damion were talking about Damion's cousin, that Damion became

24   overwhelmed with emotion, and that Damion was outside.  *Id.*  Shirley asked plaintiff who was

25   there and plaintiff told her it was plaintiff and Arlandis.  *Id.*  Shirley then told plaintiff to tell

26   Arlandis to take Damion with him to get his mind off of everything.  *Id.*  By this time, Damion

1   and Arlandis had walked over to Arlandis's car and they stood there talking.  *Id.* at 2-3.

2   A few minutes later, Damion and Arlandis went inside the house.  *Id.* at 3.  Plaintiff was

3   still on the phone with Shirley and she wanted to speak to Arlandis so she could tell him to take

4   Damion with him.  *Id.*  Damion was looking around for his other sock because he thought that he

5   had dropped it.  *Id.*  He walked outside to see if he did, but he could not find it.  *Id.*  When

6   Damion came back in the house, he asked plaintiff if she had seen his other sock.  *Id.*  Plaintiff

7   said no, but as she moved from her seat, it was behind her.  *Id.*

8   Arlandis called Damion and handed him the phone because Shirley wanted to speak with

9   Damion.  *Id.*; Lee Decl. at 5.  Damion took the phone and said hello, and from then on, he was

10   quiet because he was listening to what she was saying.  Pl.'s Decl. at 3; Lee Decl. at 5.  Then, all

11   of a sudden, Damion said, "I know my God loves me."  Pl.'s Decl. at 3; Lee Decl. at 5.

12   Shortly after that, plaintiff saw three police officers walking up to the apartment with

13   their guns drawn.  *Id.*  Plaintiff looked at Arlandis and he looked at plaintiff.  *Id.*  Both plaintiff

14   and Arlandis got up at the same time and walked over to the door.  *Id.*  Plaintiff opened her

15   screen door, and Arlandis stood to the left of her.  *Id.*  Both plaintiff and Arlandis were standing

16   in the doorway.  *Id.*  Arlandis then said, "officers, we don't have anything, let me show you."  *Id.*

17   He put one hand in the air, and with the other, he slowly pulled up his shirt and stepped forward

18   to turn around to show them he did not have anything.  *Id.*  Culp then grabbed Arlandis and put

19   him in handcuffs and rushed him over by the stairs.  *Id.*

20   By this time, Damion walked up behind plaintiff and was still on the phone.  *Id.*  While

21   Shirley was praying very loudly on the phone with Damion, she heard Damion ask, "What is

22   wrong with these people?"  Lee Decl. at 5.  The officers yelled to put the phone down, but

23   Damion just stood there with the phone still to his ear as he looked outside.  Pl.'s Decl. at 3.

24   Plaintiff also states in response to defendants' statement of undisputed facts, that Damion

25   was on the phone with his aunt and was listening to what she had to say; he was not yelling or

26   screaming.  Pl.'s Resp. to UMF, Dckt. No. 39-1, ¶ 27.  She further contends that there was no

sock in Damion's hand, and certainly no gun, just a phone, and that Damion was not waving his sock as defendants contend.  *Id.* ¶¶ 29-30.  She adds that "[t]here was no control to regain" since plaintiff and Damion "were doing what [they] could to comply."  *Id.* ¶ 31.  There was no arguing, yelling or screaming.  *Id.*  She contends that she did not try to grab the phone from Damion and that Damion did not run into the house, as defendants contend, since Damion was already in the house with the phone in his hand.  *Id.* ¶ 37.

Plaintiff went to turn toward Damion as he walked away, and Bustamante pointed his gun at plaintiff and said, "get the fuck out [of] my way or I'll blow your motherfucking brains out." Pl.'s Decl. at 3.  The next thing plaintiff knew, Culp "snatched [her] over onto this table that was directly in front of [her] living room window."  *Id.*  Culp rushed inside and Bustamante was right behind him.  *Id.*  Plaintiff then "heard the [taser] shots, but there [weren't] any commands given."  *Id.*  Shirley also heard what sounded like two gun shots and then heard a male voice, either Damion or Arlandis, saying, "No, No."  Lee Decl. at 5.  When plaintiff looked into the window, Damion was on the ground struggling to get up.  Pl.'s Decl. at 3.  As Damion got to his feet, he stumbled outside.  *Id.*  Once he stumbled outside, he slipped and fell and as he got up, he tried to get back inside the house.  *Id.*

According to plaintiff, Damion was in the house when the officers arrived and did not exit the apartment until after he was tased, so it was impossible that he ran at any time other than that.  Pl.'s Resp. to UMF ¶ 38.  In response to the officers' statements that they momentarily lost sight of Damion when he disappeared into the apartment, that they feared that Damion might be going inside to get a weapon, and they were fearful because they did not know what or who may have been inside the apartment, plaintiff contends that there was ample enough opportunity for both officers to see Damion because there was not anything to obstruct their view; the front door was wide open, the screen to the front door was fully open, and the curtains to the window were completely open.  *Id.* ¶ 39.  Also, the officers were able to observe plaintiff, Damion, and Arlandis, and there were no signs of them having any weapons, and there were also no signs of

anyone else being in the apartment. *Id.* ¶¶ 40-41.  Plaintiff contends that, with regard to Culp's

use of the taser, Culp immediately rushed into the apartment as Damion turned and walked away,

and without word set off his taser. *Id.* ¶ 42.  Damion was standing near a blue mat and was on

the phone when Culp entered, and that there was no any confrontation to gain control over

Damion because Damion was not being confrontational at all with the officers. *Id.* ¶¶ 43-44.

Plaintiff contends that Bustamante rushed inside the apartment along with Culp and was not just

outside the door, as defendants contend, and disputes that Bustamante and Culp directed Damion

to put his hands behind his back so that he could be handcuffed by stating that no other sound

was heard other than the sound of the taser. *Id.* ¶ 46.  In response to the officers' statement that

Damion seemed to comply but then he suddenly put his hands up underneath him, pushed

himself up off the floor and jumped in front of Culp and toward Bustamante, who was standing

near the doorway, plaintiff contends instead that Damion was dazed as he struggled to get to his

feet and stumble toward the door. *Id.* ¶ 47.  Contrary to Bustamante's statement that he tried to

jump out of Damion's path, but Damion ran toward him, plaintiff contends that Bustamante was

standing to the side as Damion made his way to the door. *Id.* ¶ 48.  Contrary to Culp's

statements that he initiated a second taser burst to try to control him and that the second taser

burst had very minimal effect, plaintiff contends that Damion was already weakened from the

first and second tases, so he was under control. *Id.* ¶¶ 49-50.  Damion had fallen, showing that

he had been affected by the second tase. *Id.* ¶ 51.  In response to Culp's statement that he again

directed Damion to put his hands behind his back and comply with the commands of the

deputies, but Damion refused to comply, plaintiff contends that "[y]ou can't comply with a

command that you are not given and all Damion was doing was trying to keep from getting

tased." *Id.* ¶ 52.  Although defendants contend that suddenly Damion jumped up again and

rushed toward Bustamante, plaintiff denies that Damion rushed toward Bustamante and contends

instead that in a weakened state, Damion tried to make his way back to the house and that

Bustamante happened to be in that direction. *Id.* ¶ 53.  Plaintiff contends that there was no need

1   for Culp to deploy the taser a third time because Damion was already in a weakened state.  *Id.*

2   ¶ 54.

3          In response to defendants' statement that Damion wrapped his arms around Bustamante,

4   causing there to be very close bodily contact with Bustamante, plaintiff contends that as Damion

5   tried to get up and make his way back inside the house, Bustamante pushed him up against the

6   stucco wall.  *Id.* ¶ 55; Pl.'s Decl. at 3.  Damion's knees buckled and he was sliding down the

7   wall.  Pl.'s Decl. at 3.  Bustamante braced himself, fired two shots, and Damion fell.  *Id.*  Neither

8   Culp nor Candido tried to help.  *Id.*  Candido was standing in the grass with his rifle and Culp

9   was nowhere in sight.  *Id.*  Bustamante only had one gun in his possession since Candido had the

10  rifle.  *Id.*; Pl.'s Resp. to UMF ¶ 59.  There was never a struggle between Bustamante and

11  Damion; Damion was in a weakened state and was buckling at his knees and Bustamante braced

12  himself and shot twice.  Pl.'s Resp. to UMF ¶ 55.

13         In response to Bustamante's statement that as Damion had his arms wrapped around

14  Bustamante, Bustamante tried to keep his LER weapon out of Damion's reach, plaintiff contends

15  that there was no rifle in Bustamante's possession.  *Id.* ¶ 59.  Also, in response to Bustamante's

16  statement that he felt Damion tugging on his belt and holster and immediately recognized that

17  Damion was actively trying to take away his service pistol, plaintiff contends Damion was not

18  able to grab at anything because he was shot by that time.  *Id.* ¶ 60.  Plaintiff also disputes the

19  officers' statement that Candido ran over to the altercation and tried to pull Damion off of

20  Bustamante, stating that Damion was already shot on the ground and Candido stood in the same

21  spot he was in when he first arrived.  *Id.* ¶ 61.  In response to Bustamante's statement that he

22  attempted to release the safety hood on his security holster so that he could gain access to his

23  service pistol because he believed that the escalating degree of Damion's physical contact was

24  most likely going to warrant utilizing his firearm, plaintiff states that Bustamante had no struggle

25  with Damion because he had him pressed so hard against the wall that when Bustamante shot

26  Damion, the bullets did not exit.  *Id.* ¶ 62.  Additionally, although Bustamante states that he went

to release the safety hood on his security holster and realized that it had already been released, plaintiff contends that Bustamante left his own holster hood released because in the beginning of the incident, the officers came in with their guns drawn out and then Bustamante had the gun in his hands at all times. *Id.* ¶ 63.  Regardless, plaintiff contends that Damion was already shot at this time. *Id.*  Plaintiff further contends that Bustamante's concerns that Damion had tried, and was continuing to try, to take away his fully-loaded pistol in the course of the physical struggle are unfounded since Damion was already shot and on the ground at this time. *Id.* ¶ 64.  Finally, plaintiff contends that Bustamante's statement that he was concerned about protecting the LER that was strapped to his chest is unfounded because Candido had the LER and because Damion was already shot at this time. *Id.* ¶ 65.

Plaintiff contends the sounds of the shots pierced her ears since she was standing just a few feet behind Bustamante as he held Damion up against the wall and shot him.  Pl.'s Decl. at 3.  The detective later told plaintiff that Damion had passed away from the results of his wounds. *Id.* at 4.

III.    MOTION FOR SUMMARY JUDGMENT

A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any  material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

////

////

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See N.W. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex*, 477 U.S. at 323.

Focus on where the burden of proof lies as to the issue in question is crucial to summary judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem*

1   *Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).  In this regard, "a complete failure of

2   proof concerning an essential element of the nonmoving party's case necessarily renders all

3   other facts immaterial."  *Celotex*, 477 U.S. at 323.   In attempting to establish the existence of a

4   factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of

5   its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

6   admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R.

7   Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  It is sufficient that "the claimed factual dispute

8   be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

9   *T.W. Elec. Serv.*, 809 F.2d at 631.

10       Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the

11   proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587

12   (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the

13   opposing party must demonstrate with adequate evidence a genuine issue for trial.

14   *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).   The opposing party must do

15   so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence

16   presented."  *Anderson*, 477 U.S. at 248, 252.  If the evidence presented could not support a

17   judgment in the opposing party's favor, there is no genuine issue.  *Id.*; *Celotex*, 477 U.S. at 323.

18       In resolving a summary judgment motion, the court examines the pleadings, depositions,

19   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

20   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at

21   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

22   drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences

23   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

24   predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F.

25   Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

26   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

1    some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

2    not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

3    trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

4        B.    Analysis

5            1.    First Claim – Damion's Fifth Amendment Claim Under § 1983

6        Defendants move for summary judgment on plaintiff's claim under § 1983 that

7    defendants violated Damion's Fifth Amendment due process rights.  Dckt. No. 34 at 18.  The

8    Fifth Amendment's Due Process Clause applies only to the federal government or federal

9    actions.  *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001) ("The Due Process Clause

10   of the Fifth Amendment and the equal protection component thereof apply only to actions of the

11   federal government-not to those of state or local governments."); *Dusenbery v. United States*,

12   534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the

13   United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States,

14   from depriving any person of property without 'due process of law.'").  Here, plaintiff does not

15   allege any federal action and there is no evidence that any of the defendants had any connection

16   to the federal government.  Therefore, defendants are entitled to summary judgment on

17   plaintiff's claim that defendants violated Damion's Fifth Amendment due process rights.

18           2.    First Claim – Damion's Fourteenth Amendment Claim Under § 1983

19       Defendants also move for summary judgment on plaintiff's claim under § 1983 that

20   defendants violated Damion's Fourteenth Amendment, arguing that the claims are governed by

21   the Fourth Amendment.  Dckt. No. 34 at 18-19.  Here, plaintiff has pled a Fourth Amendment

22   claim based on the "unreasonable seizure" of Damion.  Compl. at 4:25.  As defendants contend,

23   "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or

24   Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific

25   provision, not under the rubric of substantive due process."  *United States v. Lanier*, 520 U.S.

26   259, 272 n.7 (1997); *see also Trautman v. Lagalski*, 28 F. Supp.2d 327, 330 (W.D. Pa. 1998).

1    Since Damion's claims arise out of conduct purported to have occurred in the course of action

2    that involves the use of force and is pre-arraignment in nature, the claims are governed by the

3    Fourth Amendment, not the Fourteenth Amendment. *See Graham v. Connor*, 490 U.S. at 394

4    ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying

5    the specific constitutional right allegedly infringed by the challenged application of force. . . . In

6    most instances, that will be either the Fourth Amendment's prohibition against unreasonable

7    seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which

8    are the two primary sources of constitutional protection against physically abusive governmental

9    conduct. The validity of the claim must then be judged by reference to the specific constitutional

10    standard which governs that right, rather than to some generalized 'excessive force' standard.").

11    Accordingly, defendants are entitled to summary judgment on plaintiff's claim that defendants

12    violated Damion's Fourteenth Amendment rights.

13             3.        First Claim – Damion's Fourth Amendment Claim Under § 1983

14         Defendants also move for summary judgment on plaintiff's claim that defendants

15    violated Damion's Fourth Amendment rights, arguing that none of the three defendant officers

16    used excessive force against Damion. Dckt. No. 34 at 19-22. Defendants further contend that,

17    assuming arguendo that plaintiff has pled sufficient facts to state a Fourth Amendment claim

18    against any of the officers, each of the officers is entitled to qualified immunity on that claim.

19    *Id.* at 23-26.

20         Excessive force claims are analyzed under the "objective reasonableness" standard of the

21    Fourth Amendment. *Graham*, 490 U.S. at 388. This inquiry "requires a careful balancing of

22    'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against

23    the countervailing governmental interests at stake." *Id.* at 396.

24         In determining whether law enforcement officers used excessive and, therefore,

25    constitutionally unreasonable force in the course of an arrest, the Ninth Circuit employs a

26    three-step analysis. *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003). First, the court

1   assesses "the gravity of the particular intrusion on Fourth Amendment interests by evaluating the

2   type and amount of force inflicted." *Id*. at 964.  Second, the court assesses "the importance of

3   the government interests at stake" by evaluating the factors set forth by the United States

4   Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989).  These factors include: (1) the

5   severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of

6   the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to

7   evade arrest by flight.  *Graham*, 490 U.S. at 396.  Third, the court must consider the totality of

8   the circumstances and weigh the gravity of the intrusion against the government's interest to

9   determine whether the force employed was constitutionally reasonable.  *Miller*, 340 F.3d at 964;

10  *see also Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994) (stating the "inquiry is not

11  limited to the specific *Graham* factors, [the court] must look to whatever specific factors may be

12  appropriate in a particular case, whether or not listed in *Graham*, and then must consider

13  'whether the totality of the circumstances justifies a particular sort of seizure.'").

14          When evaluating an excessive force claim, summary judgment is appropriate if the court

15  "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of

16  force was objectively reasonable under all circumstances."  *Scott v. Henrich*, 39 F.3d 912, 915

17  (9th Cir. 1994).  In *Graham*, the Supreme Court made clear that the reasonableness of the force

18  used must be judged from the perspective of a reasonable officer on the scene, making

19  allowances for the split-second judgments officers are required to make in "tense, uncertain, and

20  rapidly-evolving" situations.  490 U.S. at 396-97.  In other words, the court must evaluate an

21  officer's actions "from the perspective of a reasonable officer on the scene, rather than with the

22  20/20 vision of hindsight."  *Id.* at 396.  Officers are not required to use the least intrusive means

23  available; they simply must act within the range of reasonable conduct.  *Brooks,* 599 F.3d at

24  1025.  "Determination of that reasonable range requires consideration of the totality of the

25  circumstances."  *Id.*

26  ////

In analyzing qualified immunity, which is "an entitlement not to stand trial or face the other burdens of litigation," the court employs a two-prong analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). "An officer will be denied qualified immunity in a § 1983 action only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Torres*, 2011 WL 3659355, at *3 (citing *Saucier*, 533 U.S. at 201–02; *Liberal v. Estrada*, 632 F.3d 1064, 1076 (9th Cir. 2011)).

Whether the defendant violated a constitutional right and whether the right was clearly established at the time of the violation are pure legal questions for the court. *See Phillips v. Hust*, 477 F.3d 1070, 1079 (9th Cir. 2007). However, even where a right was clearly established, the question remains whether the defendants' actions violated such right. That question may or may not turn on facts which are in dispute. "If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003); *see also Martinez*, 323 F.3d at 1183-85 (holding that the district court erred by granting summary judgment where there were genuine issues of material fact regarding the reasonableness inquiry of the second Saucier prong); *Torres v. City of Madera*, 2011 WL 3659355, at *3 (9th Cir. Aug. 22, 2011) ("Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is 'a question of fact best resolved by a jury,' . . . ; only in the absence of material disputes is it 'a pure question of law,'").

When identifying the right that was allegedly violated, a court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than all of the factual circumstances surrounding the alleged violation. *See Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1092-93 (9th Cir. 1998). When determining whether the right was clearly

established at the time of the violation, the inquiry must be "undertaken in light of the specific

context of the case." *Saucier*, 533 U.S. at 201.  To be clearly established, "[t]he contours of the

right must be sufficiently clear that a reasonable official would understand that what [the

official] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

However, to conclude that the right is clearly established, the court need not identify an identical

prior action. *Id.* at 640.  Absent binding precedent, the court should consider all relevant

precedents, including decisions from the Supreme Court, all federal circuits, federal district

courts, and state courts; in addition, the court should consider the likelihood that the Supreme

Court or the Ninth Circuit would decide the issue in favor of the person asserting the right.  *See*

*Elder v. Holloway*, 510 U.S. 510, 512, 516 (1994).

### a.  Deputy Bustamante

#### (1)  Violation of Fourth Amendment Rights

Deputy Bustamante moves for summary judgment on plaintiff's Fourth Amendment

excessive force claim.  Dckt. No. 34 at 19-21.

An officer may use deadly force against a suspect where the suspect poses an immediate

threat of great bodily injury or death to the officer or others.  *Tennessee v. Garner*, 471 U.S. 1,

11 (1985).  Whether the use of deadly force is reasonable is highly fact-specific, *Scott v. Harris*,

550 U.S. 372, 383 (2007), but the inquiry is objective, *Graham*, 490 U.S. at 397.  Reasonable use

of deadly force encompasses a range of conduct and the availability of less-intrusive alternatives

will not render conduct unreasonable.  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Bustamante contends he did not violate Damion's constitutional rights under the Fourth

Amendment because, even construing the facts in the light most favorable to plaintiff, a

reasonable officer in Bustamante's position had probable cause to believe that Damion posed an

immediate threat of great bodily injury or death to the other deputies, innocent bystanders, and

himself.  Bustamante argues that (1) Damion was far taller than Bustamante and significantly

outweighed him; (2) Damion had failed to comply with the directives given by the deputies, the

taser weapon seemingly had no effect on him; (3) Damion aggressively attacked Bustamante

without provocation and never showed any indication that he intended to cease his attack or

retreat in any way; (4) Bustamante knew that Damion had attempted to grab his pistol due to the

security hood already being removed, suggesting to Bustamante that Damion most likely knew

how to take a gun away from a peace officer; and (5) Bustamante knew that Damion was in close

enough proximity to him to try again to grab or attempt to take away the pistol or the rifle

strapped to Bustamante's chest, and there simply was no way for Bustamante to try to keep the

rifle secure, the pistol secure, and fight off Damion's attack all at the same time.  Dckt. No. 34 at

19-21.

   However, plaintiff disputes much of defendants' version of what happened.  Although

plaintiff concedes that Damion did not put the phone down after the officers yelled at him to do

so, plaintiff contends that Damion was on the phone listening to what his aunt was saying at the

time, and there is no indication that Damion heard the officers or knew that the officers were

speaking to him.  She also contends that she and Arlandis were seated when the deputies arrived,

and Damion was not yelling or screaming at the time.  She contends that she did not try to grab

the phone from Damion and Damion did not run into the house, as defendants contend, since

Damion was already in the house with the phone in his hand.  According to plaintiff, there was

no sock in Damion's hand and no gun, just a phone, and there was no reason to believe that he

was armed.  In response to the officers' statements that they momentarily lost sight of Damion

when he disappeared into the apartment, that they feared that Damion might be going inside to

get a weapon, and they were fearful because they did not know what or who may have been

inside the apartment, plaintiff contends that there was enough opportunity for both officers to see

Damion because there was nothing to obstruct their view; the front door was wide open, the

screen to the front door was fully open, and the curtains to the window were completely open.

   Importantly, plaintiff contends that the officers did not need to "regain control" over

Damion at any point since Damion was not being confrontational and was doing what he could

1    to comply with the deputies' orders.  Plaintiff specifically disputes that Damion was ever

2    directed to put his hands behind his back so that he could be handcuffed or that Damion ever ran

3    toward any of the officers.  Instead, plaintiff contends that Damion was dazed and weakened

4    from having been Tased three times and that Damion stumbled toward the door because he was

5    trying to keep from getting Tased again.  According to plaintiff, there was no reason to believe

6    that Damion was attempting to flee since Damion was in the house when the officers arrived and

7    did not exit the apartment until after he was Tased and then stumbled outside.

8          With regard to the shooting, plaintiff specifically contends that Damion did not rush

9    toward Bustamante.  Instead, plaintiff contends that as Damion tried to get up and make his way

10   back inside the house, Bustamante pushed him up against the stucco wall.  According to

11   plaintiff, Damion was in a weakened state and his knees buckled as he slid down the wall.

12   Bustamante then braced himself, fired two shots, and Damion fell.  Plaintiff contends that there

13   was never any struggle between Bustamante and Damion, and that Candido did not run over to

14   try to help, as he contends.  According to plaintiff, she saw that Candido was standing in the

15   grass with his rifle and that Culp was nowhere in sight.  In response to Bustamante's statement

16   that he was trying to keep his rifle out of Damion's reach, plaintiff contends that there was no

17   rifle in Bustamante's possession; instead, Candido had the rifle.  Plaintiff contends that Damion

18   did not tug at Bustamante's belt and holster in an effort to take away Bustamante's service pistol,

19   nor did Damion attempt to release the safety hood on the security holster.  Rather, plaintiff's

20   version of the story is essentially that Bustamante, without provocation, pushed Damion, who

21   was in a weakened state, up against the wall; Damion's knees buckled; and then Bustamante

22   fired two shots at Damion and killed him.

23         There plainly are material facts that are disputed by percipient witnesses to the events.

24   Applying the Ninth Circuit's three-step analysis for determining whether law enforcement

25   officers used excessive, and therefore, constitutionally unreasonable, force, it is apparent that

26   summary judgment is inappropriate here.  First, "the gravity of the particular intrusion on Fourth

1   Amendment interests" is significant here.  The force employed by Bustamante was deadly.

2   Second, there are genuine issues of material fact regarding each of the *Graham* factors: (1) the

3   severity of the crime at issue, (2) whether Damion posed an immediate threat to the safety of

4   Bustamante or others; *and* (3) whether Damion was actively resisting arrest or attempting to

5   evade arrest by flight.  Third, when considering the totality of the circumstances and weighing

6   the gravity of the intrusion against the government's interest to determine whether the force

7   employed was constitutionally reasonable, in light of the disputed issues of material fact, it

8   becomes clear that the objective reasonableness of Bustamante's conduct is "a question of fact

9   best resolved by a jury."  *Torres*, 2011 WL 3659355, at *3.  The court cannot conclude, after

10  resolving all factual disputes in favor of the plaintiff, that Bustamante's use of deadly force was

11  objectively reasonable under all circumstances, even when evaluating reasonableness of the

12  force from the perspective of a reasonable officer on the scene and making allowances for the

13  split-second judgments officers are required to make in tense, uncertain, and rapidly-evolving

14  situations.  Therefore, Bustamante's motion for summary judgment on plaintiff's Fourth

15  Amendment excessive force claim should be denied.

16                          (2)  Qualified Immunity

17       Deputy Bustamante further argues that he is entitled to qualified immunity on plaintiff's

18  Fourth Amendment excessive force claim.  Dckt. No. 34 at 25.  He contends that, even assuming

19  that his conduct violated Damion's Fourth Amendment rights, there is no clearly established law

20  that would have plainly indicated to Bustamante that using whatever means of force necessary to

21  overcome a physical attack on him by a noncompliant criminal suspect who was apparently

22  trying to take away his weapon violated the suspect's constitutional rights.  *Id.*

23       As noted above, "[a]n officer will be denied qualified immunity in a § 1983 action only if

24  (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the

25  officer's conduct violated a constitutional right, and (2) the right at issue was clearly established

26  at the time of the incident such that a reasonable officer would have understood her conduct to

be unlawful in that situation." *Torres*, 2011 WL 3659355, at *3 (citing *Saucier*, 533 U.S. at 201-02).  As far as *Saucier's* first prong, for the reasons just discussed, the facts, taken in the light most favorable to plaintiff, show that there is a genuine issue of material fact regarding whether Bustamante's conduct violated Damion's Fourth Amendment right to be free from excessive force.  For purposes of determining whether Bustamante is entitled to qualified immunity under *Saucier's* second prong, we ask whether an officer could have reasonably believed at the time that the deadly force Bustamante used was lawful under the circumstances.  Taking the facts alleged in the light most favorable to plaintiff, as is proper on summary judgment, at the time of the incident on October 15, 2008, the right to be free from an unreasonable use of deadly force was clearly established such that a reasonable officer would have understood Bustamante's conduct to be unlawful in that situation.  Specifically, based on plaintiff's version of the events, Damion was not armed, was not fleeing, and did not pose a threat of serious physical harm to Bustamante or anyone else.  It was clearly established as of October 15, 2008 that an officer may not "seize an unarmed, nondangerous suspect by shooting him dead" in the absence of "probable cause to believe that the [fleeing] suspect poses a threat of serious physical harm, either to the officer or to others."  *Garner*, 471 U.S. at 11; *accord Brosseau*, 543 U.S. at 197-99 (reaffirming the rule of *Garner* and explaining that it provides sufficient "fair warning" of a constitutional violation in "obvious" cases); *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) ("Case law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others.").  Therefore, Bustamante's motion for summary judgment on qualified immunity grounds must be denied.

### b. Deputy Culp

#### (1) Violation of Fourth Amendment Rights

Deputy Culp also moves for summary judgment on plaintiff's Fourth Amendment excessive force claim, arguing that Culp's use of the taser was objectively reasonable under the circumstances.  Dckt. No. 34 at 21.

Again, the court must consider the *Miller* and *Graham* factors, in determining whether the officer used excessive and, therefore, constitutionally unreasonable force in the course of an arrest. Thus, the court first assesses "the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Miller*, 340 F.3d at 964. Second, the court assesses "the importance of the government interests at stake" by evaluating: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Third, the court must consider the totality of the circumstances and weigh the gravity of the intrusion against the government's interest to determine whether the force employed was constitutionally reasonable. *Miller*, 340 F.3d at 964.

The Ninth Circuit has specifically held that the deployment of a taser in dart-mode, as Culp did here, constitutes an intermediate level of force, and as such, its use must be justified by a strong governmental interest that compels its use. *See Law v. City of Post Falls*, 2011 WL 744668, *9 (D. Idaho Feb. 23, 2011); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

Culp argues that he did not violate Damion's constitutional rights under the Fourth Amendment because, even construing the facts in the light most favorable to plaintiff, Culp's conduct was reasonable. Specifically, Culp contends that the deputies responded to an emergency call in which it was reported that a possibly suicidal man carrying a gun in a sock was running around in traffic pounding on the windows of passing cars. He further contends that when the deputies arrived at the location, an apartment complex, they encountered a heated family argument between Damion, plaintiff, and his brother. According to Culp, Damion refused to comply with the directives of the deputies and instead ran inside his apartment; the deputies, unsure whether he was going to retrieve a weapon, followed him into the apartment, where he continued actively refusing to follow the deputies' commands. Culp states that to gain Damion's compliance, Culp briefly used a taser which had almost no effect at all; and that despite another unsuccessful utilization of the taser, Damion then targeted Bustamante and

suddenly attacked him.  Dckt. No. 34 at 21.

Deputy Culp's version of the events, if credited by the fact finder, clearly warranted the use of the taser in the manner Culp describes.  However, as discussed above, plaintiff disputes much of defendants' version of what happened.  Although plaintiff concedes that Damion did not put the phone down after the officers yelled at him to do so, plaintiff contends that Damion was on the phone listening to what his aunt was saying at the time, and there is no indication that Damion was listening instead to the officers or knew that the officers were speaking to him.  She also contends that she and Arlandis were seated when the deputies arrived, and Damion was not yelling or screaming at the time.  As noted previously regarding Bustamente's motion, plaintiff contends that she did not try to grab the phone from Damion and that Damion did not run into the house, as defendants contend.  Rather, plaintiff insists that Damion was already in the house with the phone in his hand.  Also, according to plaintiff, there was no sock in Damion's hand and no gun, and there was no reason to believe that he was armed.  And, as discussed previously regarding the officers' statements that they momentarily lost sight of Damion when he disappeared into the apartment, plaintiff contends that there was ample enough opportunity for both officers to see Damion because there was nothing to obstruct their view; the front door was wide open, the screen to the front door was fully open, and the curtains to the window were completely open.

Importantly, plaintiff contends that the officers did not need to "regain control" over Damion at any point since Damion was doing what he could to comply with the deputies' orders and was not being confrontational.  She specifically disputes that Damion was ever directed to put his hands behind his back so that he could be handcuffed or that Damion ever ran toward any of the officers.  According to plaintiff, there was no reason to believe that Damion was attempting to flee since Damion was in the house when the officers arrived and did not exit the apartment until after he was tased and then stumbled outside.

////

Plaintiff specifically addresses the three tases deployed by Culp.  Plaintiff contends that she heard the taser shots but that there were no commands or directives given by any of the officers before or after any of the tases.  She contends that when she looked into the window after hearing the taser shots, she saw that Damion was on the ground in a daze and was struggling to get up.  She contends that as Damion got to his feet, he stumbled outside, and that once he stumbled outside, he slipped and fell and as he got up, he tried to get back inside the house.  Specifically, plaintiff contends that there was no need for Culp to deploy the taser a third time because Damion was already in a weakened state and was under control after the first and second tases, and had fallen to the ground as a result of those tases.

Here, as with Bustamante's motion, it is apparent that disputed issues of material fact preclude summary judgment.  The officers' version, if credited, could be relied on by a reasonable fact finder to conclude that the use of the taser, including its multiple applications, was justified.  However, plaintiff's version of what she witnessed, if credited, could be relied on by a reasonable fact finder to conclude that the use of the taser, and in particular the multiple tasing, was not warranted under the circumstances.  It is not the court's role to determine the credibility issues on summary judgment.

Although it is not disputed that the officers were responding to a call in which it was reported that a possibly suicidal man carrying a gun in a sock was running around in traffic pounding on the windows of passing cars, taking the facts in the light most favorable to the plaintiff and viewing those facts from the perspective of a reasonable officer on the scene, applying the remainder of the *Graham* factors, there are genuine issues of material fact regarding the threat, if any, that Damion posed to the officers or others and whether Damion was resisting arrest or attempting to flee.  As noted above, although plaintiff concedes that Damion did not respond to the officers' directive to put the phone down, Damion was on the phone and there is no indication that he was focused on the officers or knew that they were talking to him.  More importantly, plaintiff contends that there were no warnings or further directives given in advance

1    of Culp deploying the taser, and that Damion was not armed and was not being confrontational.

2    And, critically, plaintiff contends that after being tased once, and then a second time, Damion

3    was in a weakened state and could not have fled or posed a risk of danger to the officers or to

4    others.  Therefore, the court cannot conclude, after resolving all factual disputes in favor of the

5    plaintiff, that Culp's use of the dart taser, which amounts to intermediate force, three times was

6    objectively reasonable under all of the circumstances, even when evaluating the reasonableness

7    of the force from the perspective of a reasonable officer on the scene and making allowances for

8    the split-second judgments officers are required to make in tense situations.  Accordingly, Culp's

9    motion for summary judgment on plaintiff's Fourth Amendment excessive force claim must be

10   denied.

11                            (2) Qualified Immunity

12           Deputy Culp further argues that he is entitled to qualified immunity on plaintiff's Fourth

13   Amendment excessive force claim.  Culp argues that there was no clearly established law as of

14   the date of the incident (October 15, 2008) that would have indicated to Culp that his conduct

15   was in any way unlawful.  Dckt. No. 34 at 25-26.  According to Culp, Damion was completely

16   uncooperative and resistant to the officers' directives, and he ran away from the officers into the

17   apartment, where it was unknown whether he was going to retrieve a weapon or get the help of

18   another party who may have been inside the apartment.[7]  *Id.*  Culp contends that he sought to

19   gain Damion's compliance with the least intrusive but most effective means possible and

20   therefore used the taser, and that a reasonable officer in Culp's position could have made a

21   reasonable mistake of law regarding the constitutionality of taser use in the specific

22   circumstances that confronted him with respect to his interaction with Damion.  *Id.*

23           The Ninth Circuit recently analyzed the use of taser weapons in *Bryan v. MacPherson*,

24   630 F.3d 805 (9th Cir. 2010).  In discussing the officer's entitlement to qualified immunity upon

25   ───────────────

26        [7] As discussed previously, whether Damion was uncooperative and resistant is disputed
     by plaintiff.

                                           30

use of a taser in dart mode, the Circuit stated that "as of July 24, 2005, there was no Supreme

Court decision or decision of our court addressing whether the use of a taser, such as the Taser

X26, in dart mode constituted an intermediate level of force.  Indeed, before that date, the only

statement we had made regarding tasers in a published opinion was that they were among the

'variety of non-lethal 'pain compliance' weapons used by police forces.'" *Id.* at 833.  The court

in *Bryan* also noted that two other Ninth Circuit panels have recently concluded that the law

regarding tasers was not sufficiently clearly established to warrant denying officers qualified

immunity.  *Id.* (citing *Mattos v. Agarano*, 590 F.3d 1082, 1089-90 (9th Cir. 2010), *vacated to be

heard en banc*, 625 F.3d 1132 (9th Cir. Oct. 4, 2010); *Brooks v. City of Seattle*, 599 F.3d 1018,

1031 n. 18 (9th Cir. 2010), *vacated to be heard en banc*, 623 F.3d 911 (9th Cir. Sept. 30, 2010)).

Here, Culp contends that Damion was completely uncooperative and resistant to the

officers' directives, and that the officers were called to the scene to deal with someone standing

in the street who was pounding on windows of passing cars and who possibly possessed a gun.

Therefore, according to Culp, use of the taser as a means of gaining Damion's compliance was a

reasonable use of force based on the particular circumstances facing Culp at the time.  However,

as noted above, plaintiff disputes that Damion was non-compliant with the officers' directives

and specifically contends that, other than a directive to put the phone down which Damion may

not have heard, no directives were given to Damion before Culp deployed the taser *three* times.

Plaintiff also contends that Damion did not pose a threat to Culp, the officers, or others, and was

not a flight risk, and that he was in a weakened state after being tased once and then again a

second time.

Although prior to 2010, the quantum of force entailed by a taser strike was not clearly

established, "[n]evertheless, it has long been settled that gratuitous use of force against a

compliant, nonthreatening suspect violates the Fourth Amendment."  *See Bernat v. California

City Police Dept.*, 2011 WL 1103130, at *6 (E.D. Cal. Mar. 22, 2011) (Wanger, J.) ("Accepting

Plaintiff's version of the facts, Knowlton's use of his taser was not, as a matter of law, as

reasonable as the taser strike at issue in *Bryan*.  According to Plaintiff, he was not advancing toward the officers, was not agitated or shouting gibberish, and was complying with the officer's instructions at the time he was tased. Whether Knowlton is entitled to qualified immunity cannot be determined as a matter of law before factual disputes are resolved."); *Deorle*, 272 F.3d at 1285–86 (officer violated a clearly established right when, without warning, he shot a lead-filled beanbag round in the face of a mentally or emotionally disturbed, unarmed man who had committed no serious offense, and who posed no risk of flight or danger to the officers or others); *Oliver v. Fiorino*, 586 F.3d 898, 907-08 (11th Cir. 2009) (same for officer who repeatedly tased a compliant, unarmed man not suspected of any crime, even in absence of case law factually on point); *Dawkins v. City and County of Honolulu*, 2011 WL 1598788, at *14 (D. Haw. Apr. 27, 2011) ("If Dawkins told the officers he would leave occurred, and exhibited no signs that he was armed or violent, as he claims, the officers could not reasonably believe that it was constitutionally permissible to subsequently trip him to the ground, punch, and taser him."). Based on plaintiff's version of the facts, there is a genuine issue of material fact as to whether *any* force by Culp was reasonable at the time he deployed the taser the first time.  Moreover, there are genuine factual disputes material to whether use of the tase the second and the third times was reasonable.  The conflicting versions of what occurred requires credibility determinations that simply cannot be resolved on summary judgment.  As it was clearly established at the time of the incident that gratuitous use of force against a compliant, nonthreatening suspect violates the Fourth Amendment, Culp's motion for summary judgment on qualified immunity grounds must also be denied.

### c. Deputy Candido

Deputy Candido also moves for summary judgment on plaintiff's Fourth Amendment excessive force claim. Dckt. No. 34 at 22.  Candido contends that plaintiff has presented no evidence that Candido had any significant physical contact with Damion and that, even according to plaintiff's version of the events that occurred, Candido stayed outside to keep watch

over plaintiff and Damion's brother while Bustamante and Culp followed Damion into the apartment.  According to Candido, the only contact he had with Damion was when he tried to pull Damion off of Bustamante when Damion attacked him and tried to take away his weapon(s). *Id.*

As Candido argues, plaintiff has not alleged any force by Deputy Candido.  In fact, plaintiff disputes that Candido ever attempted to pull Damion off of Bustamante, and instead contends that during the altercation between Damion and Bustamante, Candido stood in the same spot he was in when he first arrived.  As there are no genuine issues of material fact regarding whether Candido used any force on Damion, let alone excessive force, Candido is entitled to summary judgment on plaintiff's Fourth Amendment claim.

### 4. Second Claim – Plaintiff's Fourteenth Amendment Claim Under § 1983

#### a. Deputy Bustamante

Deputy Bustamante also moves for summary judgment on plaintiff's Fourteenth Amendment claim asserting a deprivation of familial association in the loss of a child. Bustamante argues that there is no authority that permits plaintiff to assert a claim under the Fourteenth Amendment in conjunction with Damion's Fourth Amendment claim.  Dckt. No. 34 at 22-23.  Bustamante further argues that, assuming arguendo that there is a basis for plaintiff's Fourteenth Amendment claim, the claim nevertheless fails, as there is no evidence that Bustamante violated plaintiff's Fourteenth Amendment right to familial association, and that Bustamante is entitled to qualified immunity.  *Id.* at 23, 26-27.

Courts have recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children.  *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).  Official conduct that "shocks the conscience" in depriving parents of that interest is cognizable as a violation of due process.  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  In determining whether excessive force shocks the conscience, the first inquiry is "whether the circumstances are such that actual deliberation [by the officer] is practical."  *Id.*

1   "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to

2   shock the conscience.  On the other hand, where a law enforcement officer makes a snap

3   judgment because of an escalating situation, his conduct may only be found to shock the

4   conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."

5   *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

6          In *County of Sacramento v. Lewis*, the Supreme Court held that, in the context of a

7   high-speed chase, an officer could not be liable for a due process violation without a "purpose to

8   harm."  523 U.S. at 836.  Focusing on the fact that police officers often are required to "act

9   decisively" and make decisions "in haste, under pressure, and frequently without the luxury of a

10  second chance," the Supreme Court explained that "when unforeseen circumstances demand an

11  officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful

12  purpose to spark the shock that implicates 'the large concerns of the governors and the

13  governed.'"  *Id.* at 853.  The Court found that "[j]ust as a purpose to cause harm is needed for

14  Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a

15  pursuit case."  *Id.* at 854.

16         The Ninth Circuit expanded on *Lewis* by holding in *Porter v. Osborn* that the "purpose to

17  harm" standard applied even where there was no high-speed chase and the police were only

18  faced with an individual who, after being pepper-sprayed, refused to get out of the car but

19  instead started to drive his car at the officers.  546 F.3d 1139-40.  In *Porter*, the Ninth Circuit

20  found that actual deliberation was not practical where a five-minute altercation between the

21  officers and victim evolved quickly and forced the officers to make "repeated split-second

22  decisions."  *Id.* at 1139.  "The court noted that 'deliberation' should not be interpreted in the

23  narrow, technical sense, reasoning that the Supreme Court had rejected the deliberate

24  indifference standard even in cases where an officer giving chase could have deliberated while

25  pursuing the suspect. . . .  Instead, the heightened purpose-to-harm standard applies where a

26  suspect's evasive actions force the officers to act quickly."  *Wilkinson*, 610 F.3d at 554 (citing

34

*Porter*, 546 F.3d at 1139-40).

In *Wilkinson,* the Circuit also found that the purpose-to-harm standard was appropriate when "[w]ithin a matter of seconds, the situation evolved from a car chase to a situation involving an accelerating vehicle in dangerously close proximity to officers on foot," and the suspect's "act of accelerating in reverse despite repeated warnings to stop forced [the officer] to make a split-second decision."  610 F.3d at 554.  The court noted that the entire sequence of events "occurred in less than nine seconds."  *Id.*  The court then went on to find that because there was no evidence that the officer had a purpose to harm the suspect apart from legitimate law enforcement objectives, the plaintiffs had not established a substantive due process claim. *Id.* at 554-55.

Bustamante argues that application of the "purpose-to-harm" standard is appropriate here because actual deliberation was not practical, and there is no evidence of any intent by Bustamante to interfere with the familial relationship between Damion and plaintiff.  Dckt. No. 34 at 23.  The court acknowledges the rapidly evolving situation that developed after the deputies responded to a 911 call involving a report of a man with a gun.  The court further notes that if the officers' version of what occurred is credited at trial, there does not appear to be the sort of deliberation that could support a Fourteenth Amendment claim here absent a showing that Bustamante had a purpose to harm Damion.[8]  However, if plaintiff's version of the events is

---

[8] If the officers' testimony is credited over plaintiff's version of what occurred, a jury could easily conclude that actual deliberation was not practical. *See Hayes v. County of San Diego,* 2011 WL 982472, at *4 (9th Cir. Mar. 22, 2011) ("Here, the district court correctly applied the purpose-to-harm standard based on the deputies' snap decision that Hayes represented an immediate threat.  Neill had advised Deputy King that there were no guns in the house, and the deputies entered the residence with their guns holstered, apparently not expecting a violent confrontation with Hayes.  After Deputy King ordered Hayes to show his hands, Hayes raised both his hands to approximately shoulder level, revealing a large knife pointed tip down in his right hand. Believing that Hayes represented a threat, both deputies immediately drew their guns and fired at Hayes."); *Wilkinson,* 610 F.3d at 554 (finding purpose-to-harm standard appropriate where "[w]ithin a matter of seconds, the situation evolved from a car chase to a situation involving an accelerating vehicle in dangerously close proximity to officers on foot"); *Porter,* 546 F.3d at 1139 (finding actual deliberation was not practical where a five-minute altercation between the officers and victim evolved quickly and forced the officers to make

1   taken as true, there are genuine issues of material fact regarding whether Bustamante had time to

2   deliberate and also whether Bustamante's conduct demonstrated deliberate indifference.  *See*

3   *Kosakoff v. City of San Diego*, 2010 WL 1759455, at *10-13 (S.D. Cal. Apr. 29, 2010).

4   Specifically, plaintiff contends that when the officers arrived on scene, Damion was in the house

5   and was on the phone with his aunt, while plaintiff and Arlandis were seated.  According to

6   plaintiff, there was no arguing or yelling, and no confrontation between Damion and the

7   deputies.  She contends that there was nothing in Damion's hand other than a telephone and

8   there was no reason to believe that he was armed.[9]  She also asserts that there was no one else in

9   the apartment, and that Damion never attempted to flee.  As discussed, plaintiff also describes

10  Damion as weakened and dazed by Culp's tases, and posing no viable threat to the officers or to

11  others as Bustamante pushed Damion up against the stucco wall.  Plaintiff describes Damion's

12  knees as buckling as he slid down the wall, yet --according to plaintiff-- Bustamante braced

13  himself and fired two shots.  Based on plaintiff's version, there is a genuine issue of material fact

14  as to whether the situation was tense and dangerous, as Bustamante contends, and whether there

15  was any need for a "split-second decision" by Bustamante to shoot Damion.  Looking at the

16  totality of the circumstances, and accepting plaintiffs' allegations as true, a reasonable jury could

17  conclude that the situation was not escalating at the time of the shooting, and in fact, was

18  de-escalating, given that Damion was weakened and dazed at the time, and was neither

19  struggling with the officers nor attempting to flee.  A jury could find that Bustamante could have

20  stabilized the situation without the level of force used and, further, could "reasonably conclude

21  that the de-escalating nature of the situation gave [Bustamante] sufficient opportunity to

22  'actual[ly] deliberat[e]' on their course of conduct."  *Kosakoff,* 2010 WL 1759455, at *11 (citing

23  *Lewis*, 523 U.S. at 851); *see also Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002)

24  

25  "repeated split-second decisions").

26      [9] Plaintiff does not have percipient knowledge of what was reported to the officers from
    the 911 call.

                                        36

1 (applying "deliberate indifference" standard of review to a police stand-off, even though "police

2 officers conducting the standoff undoubtedly faced competing obligations and intense pressures

3 in making their decisions").

4      Additionally, plaintiff's version of the events establishes genuine issues of material fact

5 as to whether Bustamante demonstrated deliberate indifference.  Under the deliberate

6 indifference standard, plaintiff must demonstrate that Bustamante "'consciously disregard[ed]' a

7 substantial risk of serious harm."  *See Farmer v. Brennan*, 511 U.S. 825, 839 (1994) (citation

8 omitted).  Bustamante cannot be liable unless he was "aware of facts from which the inference

9 could be drawn that a substantial risk of serious harm exists, and [they] must also draw the

10 inference."  *See id.* at 837.  That being said, "[w]hether [Bustamante] had the requisite

11 knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways,

12 including inference from circumstantial evidence, and a factfinder may conclude that

13 [Bustamante] knew of a substantial risk from the very fact that the risk was obvious."  *Id.* at 842

14 (citations omitted).  Here, accepting plaintiff's allegations as true, a jury could reasonably find

15 that Bustamante acted unreasonably when he shot and killed Damion, at a time when Damion

16 was in a weakened, dazed, non-threatening state.  Under these circumstances, a jury could

17 conclude that "a substantial risk of serious harm" would have been obvious, and that Bustamante

18 recognized that risk but nonetheless proceeded with his course of conduct, which ultimately

19 resulted in the use of deadly force against Damion.  Accordingly, a jury could reasonably

20 conclude that plaintiff's Fourteenth Amendment rights were violated.

21      Deputy Bustamante further argues that he is entitled to qualified immunity on plaintiff's

22 Fourteenth Amendment claim.  Dckt. No. 34 at 26-27.  He argues that there was no clearly

23 established law that would have plainly indicated that his conduct would violate plaintiff's

24 Fourteenth Amendment right to familial association.  *Id.*  at 27.  The argument appears to focus

25 on whether the law was clearly established that a cause of action could be brought under § 1983

26 for deprivation of familial association arising out of a death from excessive force, rather than the

more relevant question of whether the law was clearly established that the level force used was excessive. However, "the law was clearly established that the parents of a decedent can recover under the substantive due process prong of the Fourteenth Amendment for a loss of familial association when an officer unreasonably kills a fleeing suspect" and "it was also clearly established that a due process violation exists where the police officer's conduct 'shocks the conscience.'" *Kosakoff*, 2010 WL 1759455, at *12 (citing *Curnow*, 952 F.2d at 325; *Lewis*, 523 U.S. at 846; *Moreland*, 159 F.3d at 372); *see also Jacobo v. Los Angeles County*, 2011 WL 1522345 , at *5 (C.D. Cal. Jan. 31, 2011).

Furthermore, as discussed above, under plaintiff's description of what she observed, taken in the light most favorable to plaintiff, Damion was not armed, was not fleeing, and did not pose a threat of serious physical harm to Bustamante or anyone else. It was clearly established as of October 15, 2008 that an officer may not "seize an unarmed, nondangerous suspect by shooting him dead" in the absence of "probable cause to believe that the [fleeing] suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. It also was clearly established that "gratuitous use of force against a compliant, nonthreatening suspect violates the Fourth Amendment." *See Bernat*, 2011 WL 1103130, at *6. Whether, in fact, Bustamante actually used excessive force under the circumstances will turn on the jury's assessment of the witnesses' conflicting accounts of what happened.

Therefore, Bustamante's motion for summary judgment on plaintiff's Fourteenth Amendment claim must be denied.

b. Deputies Culp and Candido

Deputies Culp and Candido also move for summary judgment on plaintiff's Fourteenth Amendment claim. As noted above, courts have recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children, and official conduct that "shocks the conscience" in depriving parents of that interest is cognizable as a violation of due process. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Here,

1    however, plaintiff has presented no evidence demonstrating that either Culp or Candido's

2    conduct deprived her of Damion's companionship since neither Culp nor Candido killed

3    Damion.  Therefore, Culp and Candido's motion for summary judgment on plaintiff's Fourteenth

4    Amendment claim should be granted.

5            5.  Third Claim – Plaintiff's § 1983 *Monell* Claim

6                a.  Sheriff McGinness

7            Defendant John McGinness, Sheriff of the Sacramento County Sheriff's Department at

8    the time of the incident moves for summary judgment on plaintiff's claims against him, arguing

9    that supervisory liability is inappropriate.  Dckt. No. 34 at 27-28.

10           Liability may be imposed on a supervisor under § 1983 if (1) the supervisor personally

11   participated in the deprivation of constitutional rights, or (2) the supervisor knew of the

12   violations and failed to act to prevent them, or (3) the supervisor implemented a policy "so

13   deficient that the policy itself 'is a repudiation of constitutional rights' and is 'the moving force

14   of the constitutional violation.'"  *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir.

15   1991).  An unconstitutional policy cannot be proved by a single incident "unless proof of the

16   incident includes proof that it was caused by an existing, unconstitutional policy."  *City of*

17   *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

18           Here, there is no evidence of an underlying constitutional violation which would subject

19   Sheriff McGinness to supervisor-type liability.  *City of Los Angeles v. Heller*, 106 S. Ct. 1571,

20   1573 (1986).  Further, there is no evidence that McGinness personally participated in any of the

21   alleged deprivations with respect to Damion or plaintiff.  Moreover, there is also no evidence

22   that McGinness knew of any violations and failed to act to prevent them or had an opportunity to

23   prevent them.  Additionally, there is no evidence that McGinness implemented any policy that

24   was so deficient that the policy itself was a repudiation of the constitutional rights of Damion or

25   plaintiff and was the moving force being any alleged violations.  At most, the alleged violations

26   amount to a single incident.  However, there is no evidence that the incident was caused by an

1  existing, unconstitutional policy implemented by McGinness.  Therefore, McGinness is entitled

2  to summary judgment on all of plaintiff's § 1983 claims.

3  b. _Monell_ Claim Against the County of Sacramento

4  The County of Sacramento also moves for summary judgment on plaintiff's § 1983

5  claims, arguing that liability is barred by _Monell v. Dep't of Soc. Servs._, 436 U.S. 658 (1978).

6  Dckt. No. 34 at 28-29.

7  In _Monell_, the Supreme Court held that municipalities may be held liable as "persons"

8  under 42 U.S.C. § 1983, but cautioned that a municipality may not be held liable for the

9  unconstitutional acts of its employees solely on a respondeat superior theory.  436 U.S. at 691.

10  Rather, the Supreme Court has "required a plaintiff seeking to impose liability on a municipality

11  under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." _Bd._

12  _of Cnty. Comm'rs v. Brown_, 520 U.S. 397, 403 (1997) (citing _Monell_, 436 U.S. at 694; _Pembaur_

13  _v. Cincinnati_, 475 U.S. 469, 480-81 (1986); _City of Canton v. Harris_, 489 U.S. 378, 389 (1989)).

14  In justifying the imposition of liability for a municipal custom, the Supreme Court has noted that

15  "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate

16  decisionmaker may fairly subject a municipality to liability on the theory that the relevant

17  practice is so wide-spread as to have the force of law."  _Id_. at 404 (citing _Monell_, 436 U.S. at

18  690-91).

19  _Monell_ liability can be established by demonstrating that the municipality has a practice

20  or custom that caused the plaintiff's injury.  Additionally, a custom or practice can be "inferred

21  from widespread practices or 'evidence of repeated constitutional violations for which the errant

22  municipal officers were not discharged or reprimanded.'" _Nadell v. Las Vegas Metro. Police_

23  _Dep't_, 268 F.3d 924, 929 (9th Cir. 2001) (quoting _Gillette v. Delmore_, 979 F.2d 1342, 1349 (9th

24  Cir. 1992), abrogated on other grounds as recognized in _Beck v. City of Upland_, 527 F.3d 853,

25  862 n.8 (9th Cir. 2008)); _see also Menotti_, 409 F.3d at 1147; _McRorie v. Shimoda_, 795 F.2d 780,

26  784 (9th Cir. 1986).  Further, in some circumstances a _policy_ of inaction, such as a policy of

1    failing to properly train employees, may form the basis for municipal liability.  *See Waggy v.*

2    *Spokane Cnty.*, 594 F.3d 707, 713 (9th Cir. 2010); *Clouthier v. Cnty. of Contra Costa*, 591 F.3d

3    1232, 1249 (9th Cir. 2010); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("In

4    limited circumstances, a local government's decision not to train certain employees about their

5    legal duty to avoid violating citizens' rights may rise to the level of an official government

6    policy for purposes of § 1983.").

7         Plaintiff's opposition failed to address the County's argument that *Monell* liability is

8    inappropriate here; therefore, it is unclear why plaintiff opines *Monell* liability is appropriate.

9    To the extent plaintiff seeks to hold the County liable based on a custom or policy of using

10   excessive force, specifically a custom or policy of using excessive deadly force and/or a custom

11   or policy of excessive use of tasers, plaintiff's claim fails because (1) the only evidence plaintiff

12   has presented is the incident at issue, which without more, is insufficient to allow a reasonable

13   jury to find that such a practice or custom exists, and (2) the County has presented undisputed

14   evidence of numerous County policies regarding the use of force (including deadly force and the

15   use of tasers) that were in place at the time of the incident and undisputed evidence that Deputies

16   Bustamante, Culp, and Candido received training regarding those policies, and plaintiff has not

17   argued nor shown that such policies were unconstitutional.  Specifically, "Sacramento County

18   Sheriff's Department ("SCSD") General Order No. 2/11, Use of Force" provides that officers

19   may use a reasonable degree of physical force in the course of their duties in instances involving,

20   among other things, acting in self-defense or in defense of another person; preventing the

21   commission of a public offense; and, effecting a lawful arrest, to prevent escape or overcome

22   resistance.  The policy also permits deputies to use deadly force in self-defense or defense of

23   another person when the officer "has a reasonable belief that there is imminent danger of death

24   or great bodily injury," or "to affect [sic] an arrest, prevent an escape, or recapture an escapee

25   when the officer has a reasonable belief that the suspect has committed or attempted to commit a

26   violent crime involving the threat of death or great bodily injury, or may cause death or great

bodily injury to an officer or another person should the suspect escape."  UMF ¶ 78.

Additionally, "SCSD General Order 2/14, Use of TASER weapons" pertains to the issuance, training and deployment of taser weapons by deputies, and provides that taser weapons will only be issued to any deputy if that deputy has (1) complete a departmentally-approved training course; and, (2) qualifies annually with the weapon in a course prescribed by the Department Rangemaster.  *Id.* ¶ 79.

"SCSD General Order 2/15, Less Lethal Force Weapons" "recognizes that officers assigned to patrol and corrections are the first responders to critical incidents.  Life threatening situations may require immediate action by officers before specialized units can arrive" and therefore it is necessary to "provide officers with the option of utilizing a variety of less lethal force weapons."  The Order provides for the use of the 37 mm weapon, the taser and the pepper ball gun.  Officers who use the taser are required to qualify annually for certification by trained sworn peace officers who have been certified to train in the use of the taser.  In conjunction with the certification, the deputy also is required to review this General Order annually.  *Id.* ¶ 80.

"SCSD General Order No. 2/05, Use of Firearms" establishes the policy regarding use of firearms: "The guiding philosophy shall be to exhaust other reasonable means of apprehension and control before resorting to the use of firearms.  This order does not preclude an officer from drawing a weapon in readiness in the course of an arrest or investigation when, in the officer's opinion, it is necessary to ensure anyone's safety or to reduce the possibility of attack or escape by a felony suspect.  The primary objective for using the weapon is to stop or disable in order to effect an apprehension."  Similar to the Use of Force Policy (General Order 2/11, supra), this Order also provides that "justification for the use of deadly force must be limited to what reasonably appears to be the facts known or perceived by an officer at the time a decision is made to fire a weapon."  *Id.* ¶ 81.

"General Order 2/01, Authorized Firearms and Ammunition" requires all SCSD officers who are issued a semi-automatic pistol (as was Bustamante) to "satisfactorily complete the

1    [SCSD] Training and Education Division's approved firearms training programs" before they are

2    authorized to use any firearms while on duty.  *Id.* ¶ 82.  Additionally, "SCSD General Order

3    2/02, Firearms Training and Qualifications" concerns, among other things, the requirement that

4    all Sacramento County deputy sheriffs must demonstrate proficiency with a firearm, that they are

5    required to demonstrate that they are qualified to carry and use a firearms a minimum of every

6    six (6) months, and as part of that qualification they must read and familiarize themselves with

7    General Order 2/05, above, pertaining to use of firearms.  In addition, General Order requires

8    that deputies review the Department's Use of Force Policy (General Order 2/11) annually and

9    certify this fact with the Department's Rangemaster.  *Id.* ¶ 83.

10   Finally, "SCSD General Order 2/03, Firearms Training and Qualification Special

11   Weapon Training" provides that any SCSD personnel who are selected to carry rifles in patrol

12   services, as was Bustamante, are required to meet all of the training requirements of General

13   Order 2/02, in regard to the use of the rifle and are required to demonstrate their proficiency in

14   the use of the weapon on a semi-annual basis.  *Id.* ¶ 84.

15   Each of the defendant deputies received training pursuant to the Sheriff's Department

16   practice in these policies at the time the incident occurred.  *Id.* ¶ 85.  Bustamante had received

17   training regarding use of force and use of firearms; Culp received training in use of force, use of

18   firearms, and taser weapons; and Candido, a relatively new deputy at the time of the incident,

19   had just finished complete training in all of subjects at the police academy at the time of the

20   incident.  *Id.* ¶¶ 86-88.

21   To the extent plaintiff contends that a County custom or practice can be inferred from

22   widespread practices or evidence of repeated constitutional violations for which the errant

23   municipal officers were not discharged or reprimanded, such a claim fails because plaintiff has

24   presented no evidence that there was a routine failure by the County to follow a general policy,

25   that the excessive force was committed pursuant to a longstanding practice or custom which

26   constitutes the "standard operating procedure" of the County, or that the County had a practice of

1    failing to properly investigate or to properly discipline employees involved in incidents of

2    excessive force.  Nor has plaintiff presented any evidence beyond the specific incident at issue

3    (which is insufficient on its own) establishing that the County failed to properly train its officers

4    regarding the use of force.  Therefore, the County is entitled to summary judgment on plaintiff's

5    § 1983 claims.

6                    6.  Fourth Claim – California Wrongful Death Claim

7         Defendants also move for summary judgment on plaintiff's wrongful death claim under

8    California law.  Dckt. No. 34 at 30-32.

9                         a.  Deputy Bustamante

10        Deputy Bustamante contends that he cannot be civilly liable for Damion's death since it

11   was the result of a justifiable homicide.  *Id.* at 30.  Bustamante further contends that his use of

12   deadly force was privileged as a matter of law pursuant to California Government Code section

13   820.2 because he reasonably feared great bodily injury or death in regard to himself or others.

14        "The elements of the cause of action for wrongful death are the tort (negligence or other

15   wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by

16   the heirs."  *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1263 (2006); *Wright v. City

17   of Los Angeles*, 219 Cal. App. 3d 318, 344, 358 (1990).  The California Supreme Court has held

18   that "an officer's lack of due care can give rise to negligence liability for the intentional shooting

19   death of a suspect."  *Munoz v. Olin*, 24 Cal.3d 629, 634 (1979) (citing *Grudt v. City of Los

20   Angeles*, 2 Cal.3d 575, 587 (1970)).  However, pursuant to California Penal Code section 196, a

21   police officer who kills someone has committed a justifiable homicide if the homicide was

22   "necessarily committed in overcoming actual resistance to the execution of some legal process,

23   or in the discharge of any other legal duty[.]"  Cal. Penal Code § 196.

24        Determining whether conduct amounted to excessive or unreasonable force under

25   California law, and/or whether a homicide was justified under Penal Code section 196, is

26   substantively identical to a Fourth Amendment analysis, as it concerns whether the

1    circumstances "reasonably create[d] a fear of death or serious bodily harm to the officer or to

2    another." *Martinez v. County of Los Angeles*, 47 Cal. App. 4th 334, 349-50 (1996); *People v.*

3    *Rivera*, 8 Cal. App. 4th 1000, 1007 (1992).

4           Additionally, California Government Code section 820.2 provides that "[e]xcept as

5    otherwise provided by statute, a public employee is not liable for an injury resulting from his act

6    or omission where the act or omission was the result of the exercise of the discretion vested in

7    him, whether or not such discretion be abused."  The same test for determining whether a

8    homicide was justifiable under Penal Code section 196 – whether the circumstances "reasonably

9    create[d] a fear of death or serious bodily harm to the officer or to another" – also applies when

10    analyzing the applicability of Government Code section 820.2.  *Martinez*, 47 Cal. App. 4th at

11    350.

12           Bustamante contends that his use of deadly force to subdue Damion was objectively

13    reasonable in light of Damion's failure to follow the commands of the officers, the lack of the

14    taser's effect on him, his attack on Bustamante, and his apparent attempt to take away

15    Bustamante's weapon.  Bustamante also states that he was very fearful of imminent great bodily

16    injury or death to himself or the other officers due to Damion's actions, especially when Damion

17    started tugging on his belt that held his sidearm weapon, and that he also feared for the safety of

18    citizens if Damion were able to wrest one or both of the fully-loaded weapons away from

19    Bustamante.

20           This, of course, is premised on crediting the officers' version of the facts and rejecting

21    plaintiff's version.  However, as discussed above, there are genuine issue of material fact

22    regarding whether Bustamante's use of deadly force was reasonable, and whether the

23    circumstances surrounding the incident reasonably created a fear in Bustamante of great bodily

24    injury or death to himself or others.  Therefore, Bustamante is not entitled to summary judgment

25    on plaintiff's wrongful death claim.

26    ////

1          b. Deputy Candido, Deputy Culp, and Sheriff McGinness

2          However, defendants Culp, Candido, and Sheriff McGinness are immune from liability

3 on plaintiff's wrongful death claims.  California Government Code section 820.8 provides that "a

4 public employee is not liable for an injury caused by the act or omission of another person."

5 Neither Culp nor Candido fired the weapon that brought about Damion's death and plaintiff has

6 presented no evidence otherwise suggesting that the conduct of either of those deputies caused

7 Damion's death.  Moreover, there are no facts to show that McGinness was present or

8 participated in the deputies' response to the call for service, the attempted detention of Damion

9 or the reasonable use of force that ultimately led to his death.  Therefore, Candido, Culp, and

10 McGinness are entitled to summary judgment on plaintiff's wrongful death claim.

11          c. County of Sacramento

12          Defendants argue that because the three deputies and Sheriff McGinness are immune

13 from liability with respect to plaintiff's wrongful death claim, there is no basis for respondeat

14 superior liability against the County.  Dckt. No. 34 at 31 (citing Cal. Gov't Code 815.2(b)

15 ("Except as otherwise provided by statute, a public entity is not liable for an injury resulting

16 from an act or omission of an employee of the public entity where the employee is immune from

17 liability.")); *Thomas v. City of Richmond*, 9 Cal. 4th 1154, 1157 (1995).

18          Although defendants rely on California Government Code section 815.2(b), that section

19 must be read in conjunction with section 815.2(a).  Subsection (a) provides that "[a] public entity

20 is liable for injury proximately caused by an act or omission of an employee of the public entity

21 within the scope of his employment if the act or omission would, apart from this section, have

22 given rise to a cause of action against that employee or his personal representative."  Section

23 815.2 is part of the Government Claims Act, which governs the liability of public entities and

24 their employees and confines it to "rigidly delineated circumstances."  *Williams v. Horvath*, 16

25 Cal. 3d 834, 838 (1976); *State of California v. Super. Ct.*, 32 Cal. 4th 1234, 1243 (2004).  The

26 Act distinguishes between public entities, which are immune from liability except as provided by

statute, California Government Code section 815, and public employees, who may be held liable to the same extent as private persons, California Government Code section 820.  Under the Act, a public entity may be held vicariously liable for injuries caused by the acts and omissions of its employees acting within the scope of their employment.  Cal. Gov't Code § 815.2(a); *Hoff v. Vacaville Unified Sch. Dist.*, 19 Cal. 4th 925, 932 (1998).  "The Legislature has recognized that the imposition of vicarious liability on a public employer is an appropriate method to ensure that victims of police misconduct are compensated.  It has done so by declining to grant immunity to public entities when their police officers engage in violent conduct.  Since the enactment of the California Tort Claims Act in 1963 (§ 810 et seq.), a governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct. . . . The decisions cited have recognized, at least implicitly, that vicarious liability is an appropriate method to ensure that victims of police misconduct are compensated."  *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 216-17 (1991).

Although section 815.2(a) provides for vicarious liability, section 815.2(b) provides that if the employee is immune for the acts performed or omitted by the employee, the public entity shall not be vicariously liable for that employee's acts or omissions.  Thus, the County's vicarious liability turns on whether the employee is, indeed, immune.  Here, as discussed above, there is a genuine issue of material fact regarding whether Bustamante is immune from liability for plaintiff's wrongful death claim.  Necessarily, then, there is also a genuine issue of material fact regarding the County's vicarious liability on plaintiff's wrongful death claim.  Accordingly, the County's motion for summary judgment on plaintiff's wrongful death claim must be denied.

7. Punitive Damages

a. Deputies Bustamante and Culp

Defendants Bustamante and Culp contend that defendants' conduct does not meet the standards required for imposition of punitive damages under § 1983.  Dckt. No. 34 at 32-34.  Defendants further contend that punitive damages are also not justified under California law.  *Id.*

1       Punitive damages may be awarded under § 1983 only if "the defendant's conduct is

2  shown to be motived by evil motive or intent, or when it involves reckless or callous indifference

3  to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1971); *Kennedy v.*

4  *Los Angeles Police Dep't*, 901 F.2d 702, 707 (9th Cir. 1989).  Here, for reasons discussed at

5  length above, although defendants disagree--there is a genuine issue of material fact regarding

6  whether Bustamante and Culp's conduct involves reckless or callous indifference to the federally

7  protected rights of Damion and plaintiff.  Therefore, Bustamante and Culp's motion for summary

8  judgment as to plaintiff's punitive damages claim should be denied.

9                      b. <u>County of Sacramento</u>

10       As the County contends argues, plaintiff cannot obtain punitive damages from the County

11  under § 1983 as a matter of law.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 261-62

12  (1981) (punitive damages not available against municipalities).  Plaintiff also cannot recover

13  punitive damages under her state law wrongful death claim against the County, as California

14  Government Code section 818 provides that "a public entity is not liable for damages awarded

15  under section 3294 of the Civil Code or other damages imposed primarily for the sake of

16  example and by way of punishing the defendant."  Cal. Gov't Code § 3294.  Therefore, the

17  County is entitled to summary judgment on plaintiff's punitive damages claims against it.

18                      c. <u>Deputy Candido and Sheriff McGinness</u>

19       Because Deputy Candido and Sheriff McGinness are entitled to summary judgment on all

20  of plaintiff's claims, as provided herein, the court need not address their motion for summary

21  judgment regarding punitive damages.

22  IV.  <u>CONCLUSION</u>

23       Accordingly, it is ORDERED that the final pretrial conference, which is currently

24  scheduled for November 7, 2011 is continued to November 21, 2011 at 1:30 p.m. in Courtroom

25  No. 10 before Judge Garland E. Burrell, Jr.  The parties shall file pretrial statements in

26  accordance with Local Rules 281 and 282.  The February 7, 2012 trial commencement date

remains the same.

Further, it is RECOMMENDED that defendants' motion for summary judgment, Dckt. No. 34, be granted in part and denied in part, as follows:

First Claim for Relief

1.  All defendants be granted summary judgment on plaintiff's first claim to the extent it is based on a violation of Damion's Fifth Amendment rights;

2.  All defendants be granted summary judgment on plaintiff's first claim to the extent it is based on a violation of Damion's Fourteenth Amendment rights;

3.  Deputy Bustamante and Deputy Culp be denied summary judgment on plaintiff's first claim to the extent it is based on a violation of Damion's Fourth Amendment rights, but Deputy Candido be granted summary judgment on that claim;

Second Claim for Relief

4.  Deputy Bustamante be denied summary judgment on plaintiff's Fourteenth Amendment claim, but Deputies Culp and Candido be granted summary judgment on that claim;

Third Claim for Relief

5.  Sheriff McGinness and the County of Sacramento be granted summary judgment on plaintiff's third claim, for § 1983 *Monell* liability;

Fourth Claim for Relief

7.  Deputy Bustamante and the County of Sacramento be denied summary judgment on plaintiff's wrongful death claim, but Deputies Culp and Candido, and Sheriff McGinness be granted summary judgment on that claim;

////

////

////

////

////

Punitive Damages

8.  Deputies Bustamante and Culp be denied summary judgment on plaintiff's punitive damages claim, but Deputy Candido, Sheriff McGinness, and the County be granted summary judgment on that claim.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  October 4, 2011.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE